1

**The Honorable Thomas S. Zilly**

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          WESTERN DISTRICT OF WASHINGTON

10                      AT SEATTLE

11

SCOTTSDALE INSURANCE COMPANY,          Case No. C15-cv-01000

12
            Plaintiff,

13                                                SCOTTSDALE INSURANCE COMPANY'S
        v.                                        MOTION FOR SUMMARY JUDGMENT
14                                                RE: THE DUTY TO DEFEND

AMERICAN MANAGEMENT SERVICES
15   EAST, LLC, AMERICAN MANAGEMENT              NOTE ON MOTION CALENDAR:
     SERVICES, CALIFORNIA, LLC,                  DECEMBER 18, 2015
16   AMERICAN MANAGEMENT SERVICES
     LLC, DBA PINNACLE, PINNACLE                ORAL ARGUMENT REQUESTED
17   BENNING LLC, PINNACLE BELVOIR LLC,
     PINNACLE MONTEREY, LLC, PINNACLE
18   IRWIN LLC, GFS RISK, LLC, GOODMAN
     REAL ESTATE, INC., GOODMAN
19   FINANCIAL SERVICES, INC., JOHN
     GOODMAN, AND STANLEY
20   HARRELSON,.

21          Defendants.

22                          I.    **INTRODUCTION**

23          Scottsdale Insurance Company ("Scottsdale") seeks a ruling in two parallel actions, 2:15-

24   cv-01000-TSZ and 2:15-cv-01004-TSZ, that it had no duty to defend its insureds against claims

25   of fraud and intentional misconduct.   The insureds—American Management Services, East,

26

SCOTTSDALE INSURANCE COMPANY'S MOTION                          SELMAN BREITMAN LLP
FOR SUMMARY JUDGMENT RE: THE DUTY TO                            800 Fifth Avenue, Suite 4100
DEFEND - 1                                                         Seattle, WA 98104
Case No.: C15-cv-01000                                   T: (206) 447-6461  F: (206) 588-4185

LLC, ("AMSE") American Management Services, California, LLC, ("AMSC"), American Management Services LLC, dba Pinnacle, ("AMS") Pinnacle Monterey, LLC , Pinnacle Irwin, LLC, Goodman Real Estate, Inc., formerly dba Goodman Financial Services, Inc., ("GRE") John Goodman ("Goodman") and Stanley Harrelson ("Harrelson")—are referred to herein collectively as "AMS."[1]   They sought defense and indemnity in two actions: *Fort Benning Family Communities, LLC v. American Management Systems East*, Superior Court for the County of Muscogee, State of Georgia, (the "Fort Benning action") and *Monterey Bay Military Housing LLC v. Pinnacle Monterey LLC*, U.S. District Court for the Northern District of California (the "MBMH action").   The Fort Benning and MBMH actions are referred to collectively as the "underlying actions."[2]

The underlying actions alleged that AMS engaged in systematic and pervasive fraud and intentional misconduct in the management of military family housing projects for the U.S. Army located in Georgia, Virginia and California.  (Ex. 16, p. 3; Ex. 21, p. 2.)[3]  They began as disputes over whether the property management agreements ("PMAs"), under which AMS entities AMSE and AMSC served as property managers, had been terminated due to revelations of bribery, kickbacks and theft in the management of a project in Fort Benning, Georgia.  (Ex. 12, pp. 2–3; Ex. 17, p. 2.)   The complaints were later amended to allege widespread fraud, intentional misconduct, and racketeering by AMS.   (Ex. 16, p. 3; Ex. 21, p. 2.)   The plaintiffs sought declaratory judgments terminating the PMAs and alleged breach of fiduciary duty, fraud and conspiracy, state and federal Civil RICO violations, unjust enrichment and disgorgement,

---

[1] AMS is referred to in the underlying complaints interchangeably as both "AMS" and "Pinnacle."
[2] Pinnacle Monterey and Pinnacle Irwin were only sued in the MBMH Action.  Pinnacle Belvoir LLC and Pinnacle Benning LLC were named as defendants in Case No. 2:15-cv-01000-TSZ, but were not sued in the underlying actions and, according to AMS's answer to Scottsdale's complaint, there is no dispute concerning these entities.  *See* Case No. 2:15-cv-01000-TSZ, Dkt. No. 10, p. 2.
[3] All Exhibits cited herein are attached to the Stipulated Exhibit List, filed in Case No. C15-cv-01004 as Dkt. Nos. 50-52, unless specifically stated otherwise.  *See also,* Dkt. No 30 in Cause No. C15-cv-01000.

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 2
Case No.: C15-cv-01000

SELMAN BREITMAN LLP
800 Fifth Avenue, Suite 4100
Seattle, WA, 98104
T: (206) 447-6461  F: (206) 588-4185

accounting, attorneys' fees, and punitive damages. (Ex. 16, pp.86–87; Ex. 21, pp. 56–57.) The Court in the Fort Benning action found that AMS had committed intentional misconduct as a matter of law. *See American Management Services East, LLC v. Fort Benning Family Communities, LLC*, 333 Ga. App. 664, 774 S.E. 2d 233 (2015). When AMS settled the underlying actions, it acknowledged that the underlying plaintiffs brought their claims in good faith and with sufficient evidence to prevail. (G. Bridgman decl., Ex. 1.)

Scottsdale insured AMS under four commercial general liability policies in effect from April 2008 to April 2012. (Exs. 6, 8-10.) Scottsdale denied coverage because the complaints did not seek covered damages. (Ex. 29.) AMS challenges Scottsdale's declination of coverage and claims it is entitled to recover "over $50.0 million" from Scottsdale and its other insurer, Lexington Insurance Company, for fees and costs allegedly incurred in the underlying actions, along with $84 million it agreed to pay in settlement of the underlying actions, plus punitive damages. (*See* Joint Status Report.) In essence, AMS seeks to be fully immunized by its insurers from any liability for fraud and intentional wrongdoing. Such immunity would violate the public policy of the State of Washington. *Am. Home Assur. Co. v. Cohen*, 124 Wn.2d 865, 871, 881 P.2d 1001, 1005 (1994) (it is against public policy to insure against intentional infliction of harm). Scottsdale seeks a determination that it did not have a duty to defend AMS for this misconduct, under policies that insured only against accidental property damage or bodily injury.

## II.    STATEMENT OF FACTS

### A.    The Clark/AMS Joint Venture

According to the Fort Benning and MBMH complaints, the underlying actions devolved from a business venture between AMS, a national property management company, and Clark Realty Capital ("Clark"), a nationwide real estate developer. Clark and AMS formed a joint venture in 2001 to pursue contracts to develop and manage privatized housing projects for the

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 3
Case No.: C15-cv-01000

SELMAN BREITMAN LLP
800 Fifth Avenue, Suite 4100
Seattle, WA, 98104
T: (206) 447-6461  F: (206) 588-4185

672084.1 380.34160

United States Armed Services.  (Ex. 16, pp. 14–16; Ex. 21, pp. 7–9.)  The contracts at issue related primarily to projects in Monterey Bay, California and Fort Benning, Georgia.

### 1. Fort Benning

The Fort Benning complaint alleged that in 2003, Clark and AMS created a limited liability company, Fort Belvoir Residential Communities, LLC ("FBRC") to act as the owner of a military housing project at Fort Belvoir, Virginia.  (Ex. 16, p. 15.)  The members of FBRC were the U.S. Army and Clark Pinnacle Belvoir, LLC, whose members were a Clark entity, Clark Belvoir, LLC, and an AMS entity, Pinnacle Belvoir, LLC.  Pinnacle Belvoir, LLC was the managing member.  (*Id.*)

Later, in 2006, Clark and AMS formed Fort Benning Family Communities, LLC ("FBFC") to act as the owner of a military housing project at Fort Benning, Georgia.  The members of FBFC were the United States Army and Clark Pinnacle Benning LLC.  Clark Pinnacle Benning LLC, the managing member, was comprised of a Clark entity, Clark Benning LLC, and an AMS entity, Pinnacle Benning LLC.  (*Id.*)

FBRC and FBFC contracted with AMS subsidiary AMS East ("AMSE") for property management.  The PMAs provided that AMSE would serve as property manager and would provide insurance for the Fort Benning and Fort Belvoir projects. (*Id.*)

### 2. Monterey Bay

The Fifth Amended Complaint in the MBMH action alleged that, in 2003, Clark and AMS created Monterey Bay Military Housing LLC ("MBMH") and California Military Communities, LLC, ("CMC") to act as the owners of military housing projects at the Presidio of Monterey, Fort Irwin, Moffett Community Housing Area, and other military bases in California. (Ex. 21, pp. 9–10.)  The managing member of MBMH, Clark Pinnacle Monterey Bay LLC, was a venture involving a Clark entity, Clark Monterey Presidio LLC, and an AMS/Pinnacle entity, Pinnacle Monterey, LLC.  (*Id.*, p. 9.)  The complaint alleged that CMC was similarly structured,

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 4
Case No.: C15-cv-01000

SELMAN BREITMAN LLP
800 Fifth Avenue, Suite 4100
Seattle, WA, 98104
T: (206) 447-6461  F: (206) 588-4185

672084.1 380.34160

with the managing member being Clark Pinnacle California Military Communities, LLC ("CPCMC"), which partnered a Clark entity, Clark Monterey Irwin, LLC, with an AMS entity, Pinnacle Irwin, LLC. (*Id.*, p.10.)

MBMH and CMC contracted with an AMS subsidiary, AMS California, Inc. ("AMSC"), for property management. The PMAs provided that AMSC would serve as property manager and would provide insurance for the MBMH and CMC projects. (*Id.*, p. 8.)

## B. The Underlying Litigation

### 1. The Fort Benning Action

On May 28, 2010, FBFC and FBRC filed their Amended Complaint in the Fort Benning action, naming AMSE and AMS as defendants. (Ex. 12.) The Amended Complaint sought declaratory judgments that the subject PMAs were "terminated for cause," alleging bribery, "kickbacks" and theft of scrap metal by AMS and AMSE at Fort Benning. (*Id.*, pp. 2–3.) Termination of the PMAs was mandatory in the event of fraud, theft and intentional misconduct. *See American Management*, 774 S.E.2d at 244–45.

On August 1, 2012, FBFC and FBRC filed their Fifth Amended Complaint in the Fort Benning action. In addition to allegations of bribery, kickbacks, and theft (Ex. 16, pp. 78–79), the plaintiffs added allegations of racketeering and Georgia Civil RICO violations and alleged that AMS falsified work-order data to inflate its annual incentive fee. (*Id.*, pp. 66, 75–83.) The plaintiffs further alleged an insurance scheme by which AMSE used the "high quality and low risk" of the military housing to subsidize the insurance costs of riskier multi-family assets personally owned by AMS/Pinnacle officers, thereby charging the plaintiffs inflated and undisclosed fees in the master insurance plan. (*Id.*, p. 66.)

On March 20, 2014, the Georgia Superior Court ruled on the parties' cross motions for summary judgment, denying AMS's motion and granting in part FBFC and FBRC's motion. The court found that AMS had committed intentional misconduct as a matter of law in falsifying

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 5
Case No.: C15-cv-01000

SELMAN BREITMAN LLP
800 Fifth Avenue, Suite 4100
Seattle, WA, 98104
T: (206) 447-6461  F: (206) 588-4185

672084.1 380.34160

work-order data to inflate incentive bonus payments.  (D. Greer decl., Ex. 1, p. 6.)  The Georgia Court of Appeals affirmed this finding in *American Management*, 774 S.E. 2d at 241.

### 2.  The MBMH Action

On June 5, 2011, MBMH, CMC, Clark Pinnacle Monterey Bay LLC ("CPMB"), Clark Monterey Presidio LLC, Clark Pinnacle California Military Communities, LLC, ("CPCMC"), and Clark Monterey Irwin, LLC sued Pinnacle Monterey LLC, Pinnacle Irwin LLC, AMSC, and AMS.  (Ex. 17.)  The MBMH action sought declaratory and injunctive relief regarding the automatic termination of the agreement based on AMS's allegedly fraudulent conduct at Fort Benning and Fort Belvoir.  (*Id.*, p. 2.)

A Third Amended Complaint was filed in the MBMH action on October 11, 2012, naming AMSC, AMS, and the Goodman entities, among others, as defendants.  (Ex. 20.)  The plaintiffs alleged that after filing their original complaint, the plaintiffs discovered that AMS employees "have engaged in widespread fraud and intentional misconduct relating to work order data, and the cover-up of such conduct, at the Monterey project."  (*Id.*, p. 2.)  This conduct "is part of a larger pattern and practice of fraud and intentional misconduct" by AMS.  (*Id.*)

The Third Amended Complaint sought restitution, disgorgement, damages, and declaratory and injunctive relief.  (*Id.*)  The plaintiffs alleged that "defendants and their employees and agents have committed systematic fraud and intentional misconduct to enrich defendants at the expense of plaintiffs, and have violated California law by engaging in unlawful, unfair and fraudulent business practices."  (*Id.*)

On August 18, 2014, the plaintiffs filed their Fourth Amended Complaint, adding a cause of action for violation of 18 USC §1961 *et seq.* (Civil RICO).  The plaintiffs alleged a pattern of racketeering at Fort Benning, Fort Belvoir, Monterey Bay, and Fort Irwin.  (Ex. 21.)  The case was removed to the U.S. District Court for the Northern District of California.[4]

---

[4] A Fifth Amended Complaint was filed on April 16, 2015, but was never tendered to Scottsdale.

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 6
Case No.: C15-cv-01000

### 3. The Underlying Settlement

The underlying plaintiffs reached a settlement with AMS in August 2015. (G. Bridgman decl., Ex. 1.) In the agreement, while not admitting liability, AMS affirmed that it was properly removed from the projects, that the underlying plaintiffs brought their claims in good faith, and that there was sufficient evidence for the underlying plaintiffs to prevail. (*Id.*).

### C. Tender of the Underlying Litigation to Scottsdale

#### 1. Initial Tender and Denial

AMS tendered the defense of the Amended Complaint in the Fort Benning action to Scottsdale on July 31, 2010. (Exs. 50, 51.) In its Notice of Claim, AMS represented that "[p]laintiff alleges frau[d] and disgorgement of profits due to accounting irregularities." (Ex. 51.) On August 5, 2010, Scottsdale acknowledged receipt of the lawsuit and advised AMS that the claims were not covered under the Scottsdale policies. (Ex. 53.) On August 17, 2010, Scottsdale denied coverage for the Amended Complaint, explaining that its policies provided coverage only for damages because of "bodily injury" or "property damage" caused by an "occurrence," as those terms are defined in the policies. (Ex. 29.)

More than two years later, on November 12, 2012, AMS tendered the Fifth Amended Complaint in the Fort Benning action and the Third Amended Complaint in the MBMH action. (Ex. 54.) On January 11, 2013, Scottsdale affirmed its declination of the Fort Benning action and denied coverage for the virtually identical MBMH action. (Ex. 30.) Scottsdale again declined the tender because there was no allegation of "bodily injury" or "property damage" caused by an "occurrence," and no allegations of "personal or advertising injury." (*Id.*)

On April 5, 2013, AMS called Scottsdale's attention to paragraphs 97, 120, and 125 in the Fort Benning Fifth Amended Complaint and paragraph 91 in the MBMH Third Amended Complaint, contending that they asserted "potentially covered property damage." (Ex. 31.)

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 7
Case No.: C15-cv-01000

SELMAN BREITMAN LLP
800 Fifth Avenue, Suite 4100
Seattle, WA, 98104
T: (206) 447-6461  F: (206) 588-4185

672084.1 380.34160

1   Paragraph 97, however, merely alleged a scheme to convert proceeds from the sale of scrap

2   metal harvested from project homes:

3           97.     Beginning in Fall 2007, Pinnacle's top three management
            employees at Fort Benning . . . *engaged in a scheme to harvest*

4           *and sell valuable scrap metal* and potentially other materials of
            value from Benning Project homes scheduled for demolition and to

5           use the proceeds for their own benefit.  Rather than accruing to the
            Project, *this money was kept in a Pinnacle safe at the property*

6           *and was not returned to the Benning Project*.  Pinnacle again did
            not inform FBFC or the Army of this *fraudulent practice*.

7

8   (Ex. 16, p. 32 (emphasis added).)

9           Paragraphs 120 and 125 relate to allegations that AMS/Pinnacle deliberately falsified

10  work orders, designating incomplete work as complete to boost completion bonuses:

11          120.    [A] former Pinnacle employee at Fort Benning . . . stated
            that "I made approximately 60 or more calls a week, following up

12          on work orders that were closed out in Yardi, indicating that work
            had been completed.  Every week, residents told me that the work

13          was not complete, and in some cases that it had not even been
            started.  I would conservatively estimate that on average, 30-40%

14          or more of the residents I called every week told me that the work
            was not complete, even though the work order was closed out in

15          Yardi, showing that it was complete."   Upon information and
            belief, the work orders were closed prematurely, even though the

16          work was not done, *in order to inflate the pass scores*.

17  (*Id.*, p. 40 (emphasis added).)  The plaintiffs went on to allege that these fraudulent tactics had

18  put the lives and safety of military personnel and their families at risk:

19          125.    Pinnacle's falsification of work order data has posed, and
            continues to pose, a risk to the life and safety of military residents.

20          Of the thousands of work orders handled each month at these
            Projects, many relate to life safety issues including smoke

21          detectors, carbon monoxide detectors, mold and other potential
            safety issues.  Because *part of the scheme to defraud included*

22          *closing out work orders where the work had not been performed*,
            Pinnacle has created a situation where the Project Owners are

23          unable to confirm that critical work orders have been responded to
            at all . . . and therefore the Owners are unable to go back and do

24          work that has not been done.  Once a work order has been falsely
            reported as completed, neither the Project Owners nor Pinnacle's

25          maintenance staff has any way to determine whether the
            maintenance problem has actually been fixed or continues to pose

26

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 8
Case No.: C15-cv-01000

672084.1 380.34160

a danger to residents.  The Owners of these Projects are currently attempting to address these *risks created by Pinnacle's fraud*.

(*Id.*, p. 42 (emphasis added).)

Likewise, paragraph 91 in the MBMH Third Amended Complaint, alleged that a practice of intentionally misrepresenting incomplete work orders as complete put military families' lives and safety at risk.  (Ex. 20, p. 24.)  The plaintiffs alleged that this "scheme to defraud" left MBMH unable to discern whether maintenance requests had actually been addressed.  (*Id.*)  These life and safety risks were "created by Pinnacle's fraud."  (*Id.*)

On April 11, 2013, Scottsdale advised AMS that the cited paragraphs failed to show a covered claim because they alleged only economic loss due to fraud and theft, and not accidental property damage.  (Ex. 32.)

### 2.  AMS's Extrinsic Evidence

Beginning on September 23, 2014, after filing an Insurance Fair Conduct Act ("IFCA") complaint with the Washington State Insurance Commissioner (Ex. 33), AMS provided extrinsic information to Scottsdale.  (Exs. 56–58.)  This included also the summary-judgment orders, in the Fort Benning action, which ruled that AMS had committed intentional misconduct as a matter of law in falsifying work-order data to inflate incentive bonus payments.  (D. Greer decl., Ex. 1.)  AMS also submitted declarations from AMS employees testifying to their participation in the work-order falsification scheme at Fort Benning and Fort Belvoir.  (Exs. 37–48.)  These declarations were filed in the MBMH action on September 21, 2014.  (*Id.*)

The declarations showed nothing more than the intentional nature of AMS/Pinnacle's conduct.  Deena Guinard, for example, testified that she was instructed to change work order "fails" to "passes" because pass percentage "was part of Pinnacle's contract regarding its incentive fee and it would impact bonuses."  (Ex. 37.)  George Boomer stated that, in addition to falsifying work-order data "to get pass percentages higher, there were times we were told by Eddie to close out open work orders when the work had not even been done"; however, they

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 9
Case No.: C15-cv-01000

SELMAN BREITMAN LLP
800 Fifth Avenue, Suite 4100
Seattle, WA, 98104
T: (206) 447-6461  F: (206) 588-4185

672084.1 380.34160

1   "would keep [a] separate list on a sheet of paper so that we could track when the work was really

2   done." (Ex. 41.) Krystal Centers reported that AMS/Pinnacle's maintenance director told her to

3   close out work orders for flooded basements. When she asked him to confirm this in writing by

4   email, he did not respond. Later, he told another employee that he had "fudged" some numbers

5   to be shown Clark and wanted to make sure they would "look correct." (Ex. 42.) Alanso Arias

6   was instructed to "bring the work orders to the office and write on them that they were

7   completed – even though the work was not done . . . so that they could close out the work orders

8   in the system, so that Pinnacle wouldn't look bad." (Ex. 47.)

9          The other witnesses confirmed the intentional and pervasive nature of this scheme.

10  Jacqueline Mackey, for example, testified that work orders were "closed out" when work was not

11  completed and that this was a pattern reported by her coworkers over the years. (Ex. 38.) Dane

12  Smith was taught by managers how to close out work orders and change the response times to

13  make work orders pass. (Ex. 43.) Patricia Zyzyk was told to change work-order data to make

14  work orders pass and get pass rate in the "high 90%, ideally at 98%." (Ex. 44.) Wanda Gotay

15  spent 60–70% of her time "falsifying the response dates and times, and closing out open work

16  orders where the work had not been done." (Ex. 45.) Joshua Merrill was told to have a pass

17  percentage "close to 95% or higher." (Ex. 46.) And Harold Hernandez was given "a box with

18  hundreds of open work orders and told to close them within the correct time parameters, even

19  though [he] had no information regarding whether the work had been done." (Ex. 48.)

20         AMS added to this extrinsic evidence on April 15, 2015, when it submitted a Declaration

21  from U.S. Army Undersecretary Paul David Cramer. Mr. Cramer's declaration was dated

22  September 19, 2014 and was filed in the MBMH action on March 24, 2015. (Ex. 49.) He

23  represented that life safety issues have impacted military families at installations where

24  AMS/Pinnacle was the property manager. He also clarified, however, that he was "*not*

25  *suggesting that these incidents were the direct result of conduct by Pinnacle*." (*Id.*, ¶ 7

26

---

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 10
Case No.: C15-cv-01000

SELMAN BREITMAN LLP
800 Fifth Avenue, Suite 4100
Seattle, WA, 98104
T: (206) 447-6461  F: (206) 588-4185

672084.1 380.34160

1   (emphasis added).)   Rather, they illustrated the importance of trustworthy responses to work

2   orders.   This supported the Army's assertion "that prompt removal of AMSC is in the best

3   interest of the Army and of its soldier-residents at Monterey and Irwin." (*Id.*, ¶ 8.) Nowhere did

4   Cramer state that the MBMH action sought damages for bodily injury or property damage.

5       Scottsdale again denied coverage.  (Exs. 35, 36.)

6   **C.    The Scottsdale Policies**

7       Scottsdale issued four policies to AMS for the policy periods from April 10, 2008

8   through April 10, 2012.  (Exs. 6, 8–10.)[5]  The 2008–09 and 2009–10 policies described the

9   named insureds under the policies as follows:

10          [AMS] and all affiliated, subsidiary, associated or allied
            companies,   corporations,   firms,   entities,   partnerships,
11          organizations or joint ventures as now exist or may hereafter be
            constituted or acquired, or for which the named insured has the
12          responsibility for placing insurance and for which similar coverage
            is not otherwise more specifically provided, including but not
13          limited to . . . [AMSE]; . . . [AMSC].

14   (Ex. 6, pp. 82–83; Ex. 8, p. 6.)  Beginning with the 2010–11 policy, this term was changed to

15   read:

16          [AMS] and any parent, subsidiary, division, affiliate, associates or
            allied companies, corporations, firms, LLCs, partnerships, or joint
17          ventures that have existed now or may hereafter exist that are
            owned, financially controlled or managed and/or in which an
18          insured has either insurable interest or an obligation to insured
            [sic], to the extent of that interest or obligation including but not
19          limited to . . . [AMSE]; . . . [AMSC].

20   (Ex. 9, p. 7; Ex. 10, p. 7.)

21       The Scottsdale policies covered "those sums that the insured becomes legally obligated to

22   pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."

23

24   _____

25   [5] Scottsdale also issued an Excess Liability Policy to AMS for the 2008–09 policy period. (Ex. 7.) This
     policy's coverage was subject to the same exclusions in the underlying insurance. (*Id.*, p. 8.) However,
26   there was no duty to defend under the excess policy. (*Id.*)

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 11
Case No.: C15-cv-01000

SELMAN BREITMAN LLP
800 Fifth Avenue, Suite 4100
Seattle, WA, 98104
T: (206) 447-6461  F: (206) 588-4185

(Ex. 6, p. 21; Ex. 8, p. 22; Ex. 9, p. 21; Ex. 10, p. 24.)[6] Scottsdale had "the right and duty to defend the insured against any 'suit' seeking those damages." (*Id.*) But it expressly had "no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply." (*Id.*)

"Bodily injury" is defined as "bodily injury, disability, sickness, or disease sustained by a person, including death resulting from any of these at any time." (Ex. 6, p. 33; Ex. 8, p. 34; Ex. 9, p. 33; Ex. 10, p. 36.) "Property damage" is: (a) "Physical injury to tangible property, including all resulting loss of use of that property"; or (b) "Loss of use of tangible property that is not physically injured." (Ex. 6, p. 35; Ex. 8, p. 36; Ex. 9, p. 35; Ex. 10, p. 38.)

This insurance applies only if "[t]he 'bodily injury' or 'property damage' is caused by an 'occurrence' . . . ." (Ex. 6, p. 21; Ex. 8, p. 22; Ex. 9, p. 21; Ex. 10, p. 24.) An "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Ex. 6, p. 34; Ex. 8, p. 35; Ex. 9, p. 34; Ex. 10, p. 37.)

Additionally, the policies expressly exclude "Expected Or Intended Injury":

> "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

(Ex. 6, p. 22; Ex. 8, p. 23; Ex. 9, p. 22; Ex. 10, p. 25.)

The policies also expressly exclude from coverage any damage to property owned, rented or occupied by, or under the care, custody or control of, the insured:

> "Property damage" to:
> (1)  Property you own, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of

---

[6] The policies also contain a Coverage B, for "personal and advertising injury," which applies only to injuries caused by one of seven enumerated offenses. (Ex. 6, pp. 26, 34; Ex. 8, pp. 27, 35; Ex. 9, pp. 26, 34; Ex. 10, pp. 29, 37.) Coverage B is not at issue here. (G. Bridgman decl., Ex. 2.)

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 12
Case No.: C15-cv-01000

SELMAN BREITMAN LLP
800 Fifth Avenue, Suite 4100
Seattle, WA, 98104
T: (206) 447-6461  F: (206) 588-4185

672084.1 380.34160

such property for any reason, including prevention of injury to a person or damage to another's property.

. . . .

(4)   Personal property in the care, custody or control of the insured.

(Ex. 6, p. 24; Ex. 8, p. 25; Ex. 9, p. 24, Ex. 13, p. 27.)  The policy defines the term "you" to mean the named insured in the declarations and "any other person or organization qualifying as a named insured under this policy."  (Ex. 6, p. 21; Ex. 8, p. 22; Ex. 9, p. 21; Ex. 10, p. 24.)

### III.   EVIDENCE RELIED UPON

Scottsdale bases this motion on the pleadings and other documents on file with the Court, in particular Dkt. Nos. 50-52 in Case No. 2:15-cv-01004-TSZ, the concurrently filed declarations of Geoff Bridgman and Douglas Greer with attached exhibits, and the law as set forth below.

### IV.   AUTHORITY AND ARGUMENT

A party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show initially the absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The burden then shifts to the non-moving party to establish the existence of an issue of fact regarding an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Because federal jurisdiction is based on diversity of citizenship, Washington substantive law applies.  *Conrad v. Ace Property & Cas. Ins. Co.,* 532 F.3d 1000, 1004 (9th Cir. 2008).  The "interpretation of language in an insurance policy is a matter of law" for the Court to decide. *Allstate Ins. Co. v. Peasley,* 131 Wn.2d 420, 424, 932 P.2d 1244 (1997); *see also Woo v. Fireman's Fund Ins. Co.,* 161 Wn.2d 43, 52, 164 P.3d 454 (2007) ("Interpretation of an insurance contract is a question of law").  When, as here, the material facts are not disputed,

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 13
Case No.: C15-cv-01000

SELMAN BREITMAN LLP
800 Fifth Avenue, Suite 4100
Seattle, WA, 98104
T: (206) 447-6461  F: (206) 588-4185

672084.1 380.34160

1  summary judgment is appropriate.  *See McDonald v. State Farm Fire & Casualty Co.*, 119

2  Wn.2d 724, 730-31, 837 P.2d 1000 (1992).

3  **A.    Scottsdale had no duty to defend AMS because the underlying actions did not assert a covered claim.**

4

5  In Washington, the duty to defend is determined under the "eight corners" rule.  *Expedia,*

6  *Inc. v. Steadfast Ins. Co.*, 180 Wn.2d 793, 803, 329 P.3d 59 (2014).  The Court compares the four

7  corners of the insurance contract to the allegations in the four corners of the complaint.  *Id.*  The

8  duty to defend is triggered only when the complaint, "construed liberally, alleges facts which

9  could, if proven, impose liability upon the insured within the policy's coverage."  *Am. Best Food,*

10  *Inc. v. Alea London, Ltd.*, 168 Wn.2d 398, 404-05, 229 P.3d 693 (2010) (quoting *Truck Ins.*

11  *Exch. v. VanPort Homes, Inc.*, 147 Wn.2d 751, 760, 58 P.3d 276 (2002)).  If "it is clear that the

12  claim is not covered," there is no duty to defend.  *Id.* at 405.  If coverage is ambiguous, however,

13  a duty to defend may arise from extrinsic evidence.  *Truck*, 147 Wn.2d at 761.

14  Here, the lack of coverage is unambiguously shown within the eight corners of the

15  policies and the underlying complaints.  The complaints sought damages only for economic

16  injury, while the policies covered only claims for bodily injury or property damage.  Moreover,

17  AMS's extrinsic evidence only confirmed that the underlying actions alleged intentional,

18  fraudulent conduct by AMS, which is expressly excluded from coverage.

19  **1.    Under the "eight corners" of the complaints and the policies, there was no covered claim for bodily injury or property damage.**

20

21  The underlying complaint allegations are anything but ambiguous.  The complaints allege

22  pervasive fraud and racketeering by AMS in managing the subject housing projects.  (Ex. 16, pp.

23  3–5; Ex. 21, p. 3.)  The complaints seek equitable and injunctive relief and damages for financial

24  losses resulting from AMS's intentional misconduct and fraud. (Ex. 16, pp. 86–87; Ex. 21, pp.

25  56–57.)  The Scottsdale policies, in contrast, agree to cover only those sums that the insured

26  becomes legally obligated to pay as damages because of "'bodily injury' or 'property damage,'"

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 14
Case No.: C15-cv-01000

SELMAN BREITMAN LLP
800 Fifth Avenue, Suite 4100
Seattle, WA, 98104
T: (206) 447-6461  F: (206) 588-4185

672084.1 380.34160

and to defend only against claims "seeking those damages." (Ex. 6, p. 21; Ex. 8, p. 22; Ex. 9, p. 21; Ex. 10, p. 24.) Fraudulent business practices fail to trigger any such coverage.

> a.    *Losses caused by AMS's fraud and intentional acts are not bodily injury or property damage.*

The underlying complaints assert no covered claims. Indeed, the plaintiffs are business entities, incapable of incurring bodily injury. As for property damage, the controlling definition of "property damage" is the one provided by the insurance policy. *Overton v. Consol. Ins. Co.*, 145 Wn.2d 417, 429, 38 P.3d 322 (2002). "Courts interpreting insurance policies should be bound by definitions provided therein." *Id.* at 427.

The Scottsdale policies define "property damage," in part, as "Physical injury to tangible property, including all resulting loss of use of that property."[7] (Ex. 6, p. 24; Ex. 8, p. 25; Ex. 9, p. 24, Ex. 13, p. 27.) The underlying plaintiffs asserted no claims for physical injury to tangible property. Rather, the underlying actions alleged bribery, kickbacks, theft, falsification of work orders to obtain higher annual incentive fees, and other fraudulent acts. (Ex. 16, pp. 66, 75–83; Ex. 21, pp. 24–25, 50–53.)

Thus, the complaints alleged damages caused by fraudulent and intentional conduct and not bodily injury or property damage. Business losses are not covered under a commercial liability policy. *Walla Walla Coll. v. Ohio Cas. Ins. Co.*, 149 Wn. App. 726, 735, (2009) (diminution in the value of a fuel storage tank is not property damage under policies defining "property damage" as "physical injury to tangible property, including all resulting loss of that property"); *Scottsdale Ins. Co. v. International Protective Agency, Inc.*, 105 Wn. App. 244, 249–50 (2001) (restaurant's loss of its liquor license and damage to its business allegedly as a result of the security contractor's failure to prevent a minor from gaining admission was not

---

[7] Part b. of the definition provides coverage for "[l]oss of use of tangible property that is not physically injured," but also requires that the loss of use be caused by an "occurrence," as discussed below.

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 15
Case No.: C15-cv-01000

SELMAN BREITMAN LLP
800 Fifth Avenue, Suite 4100
Seattle, WA, 98104
T: (206) 447-6461  F: (206) 588-4185

672084.1 380.34160

"property damage"); *Guelich v. Am. Prot. Ins. Co.,* 54 Wn. App. 117, 121, (1989) (the obstruction of the view from a property, resulting in diminution of value, is not "physical injury to tangible property"); *Country Mutual Insurance Company v. Deatly,* No. 13-CV-3029-TOR, 2013 WL 6119231, at *5 (E.D. Wash. Nov. 21, 2013) ("[F]inancial losses caused by the sale of fraudulent or misrepresented investments are beyond the scope of standard property damage coverage"), *appeal filed* (9th Cir. Dec. 20, 2013). Indeed, it would contravene Washington public policy to allow an insured to benefit from such wrongful acts. *See Unigard Mut. Ins. Co. v. Spokane Sch. Dist. No. 81,* 20 Wn. App. 261, 265 (1978).

Washington's prohibition on "property damage" insurance coverage for financial losses caused by fraudulent activity comports with the law throughout the nation. *See Tschimperle v. Aetna Cas. & Sur. Co.,* 529 N.W.2d 421, 425 (Minn.1995) (financial losses stemming from fraudulent sale of tax shelter investment do not constitute "loss of use of tangible property"); *Giddings v. Indus. Indem. Co.,* 112 Cal.App.3d 213, 219 (1980) ("strictly economic losses like lost profits, loss of goodwill, loss of the anticipated benefit of a bargain, and loss of an investment, do not constitute damage or injury to tangible property covered by a [CGL] policy"); *Allstate Ins. Co. v. Interbank Fin. Servs.,* 215 Cal.App.3d 825, 830–31 (1989) (insurer not required to defend against lawsuits alleging that insured sold fraudulent tax shelter investments); *Keating v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 995 F.2d 154, 156 (9th Cir.1993) ("losses caused by allegedly fraudulent sale of investment bonds not covered under CGL policy"). Thus, the plaintiffs in the underlying actions did not allege bodily injury as property damage, and they did not seek any damages that are potentially within the coverage of Scottsdale's policies.

> b. *Allegations that AMS stole scrap metal and falsified work orders are not claims for "property damage" or "bodily injury."*

As noted above, AMS claims that certain paragraphs in the complaints in the underlying actions show a "possibility of property damage or bodily injury." (Exs. 31, 33.) These paragraphs present two allegations. The first is that AMS intentionally converted scrap metal,

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 16
Case No.: C15-cv-01000

SELMAN BREITMAN LLP
800 Fifth Avenue, Suite 4100
Seattle, WA, 98104
T: (206) 447-6461  F: (206) 588-4185

672084.1 380.34160

1  belonging to the Fort Benning plaintiffs, for its own financial gain.  The second is that AMS

2  fraudulently falsified work orders to inflate its completion statistics.

3        With respect to the conversion of scrap metal, this is an allegation of theft, nothing more.

4  *See* Ex. 16, ¶ 97 ("Rather than accruing to the Project, this money was kept in a Pinnacle safe . . .

5  . [AMS] did not inform FBFC or the Army of this fraudulent practice.")  This allegation fails to

6  trigger the policies' definition of "property damage."  Indeed, such an interpretation would

7  contravene Washington's public policy against liability insurance for intentional harm.  *See Am.*

8  *Home Assur. Co. v. Cohen*, 124 Wn.2d 865, 871, 881 P.2d 1001 (1994).

9        As for the falsification of work orders, these paragraphs allege a scheme to defraud.  *See,*

10  *e.g.*, Ex. 20, ¶ 91 ("the scheme to defraud included closing out work orders where the work had

11  not been performed"), ¶ 96 ("Somerville and Schuster directed that records be falsified in order

12  to boost Pinnacle's incentive compensation and their bonuses."); Ex. 16, ¶ 120 ("Upon

13  information and belief, the work orders were closed prematurely, even though the work was not

14  done, in order to inflate the pass scores.")

15        To be sure, the underlying complaints alleged that this scheme put the lives and safety of

16  military families ***at risk***.  Yet, the risk of harm does not trigger coverage under a liability policy.

17  *Wellbrook v. Assurance Co.*, 90 Wn. App. 234, 243 (1998).  Here, nowhere did the complaints

18  claim that the practice caused any injury or damage or that the plaintiffs were entitled to damages

19  for bodily injury or property damage caused by the falsification of work orders.  Nor did the

20  underlying complaints allege that the plaintiffs even had standing to assert claims for damages

21  incurred by military families.

22        In short, these allegations show that the underlying actions are commercial disputes

23  alleging fraud and intentional misconduct by AMS.  They fail to show that the underlying

24  complaints sought damages for bodily injury or property damage.  As such, the underlying

25  actions were not covered claims, and Scottsdale had no duty to defend AMS.

26

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 17
Case No.: C15-cv-01000

SELMAN BREITMAN LLP
800 Fifth Avenue, Suite 4100
Seattle, WA, 98104
T: (206) 447-6461  F: (206) 588-4185

**2.      Scottsdale had no duty to defend because the underlying actions did not allege a covered "occurrence."**

AMS's claim for a defense fails for the additional reason that the underlying actions did not allege an "occurrence." As set forth above, before coverage can attach AMS must prove not only that the underlying complaints alleged "bodily injury" or "property damage," but also that such injury or damage was caused by an "occurrence" as that term is defined in the policies. (Ex. 6, p. 21; Ex. 8, p. 22; Ex. 9, p. 21; Ex. 10, p. 24.) The policies define "occurrence" as an "accident." (Ex. 6, p. 34; Ex. 8, p. 35; Ex. 9, p. 34; Ex. 10, p. 37.)

Where an insurance policy defines an occurrence as an "accident," it denotes "an unusual, unexpected, and unforeseen happening." *Grange Ins. Co. v. Brosseau*, 113 Wn.2d 91, 95, 776 P.2d 123 (1989). *See also*, *Grange Ins. Ass'n v. Roberts*, 179 Wn. App. 739, 756, 320 P.3d 77 (2013) (holding no duty to defend where insured acted intentionally). Washington law is settled that "an accident is never present when *a deliberate act* is performed unless some additional unexpected, independent and unforeseen happening occurs which produces or brings about the result of injury or death. *The means as well as the result must be unforeseen, involuntary, unexpected and unusual.*" *Brosseau*, 113 Wn.2d at 96 (emphasis added) (citing *Unigard*, 20 Wn. App. at 265); *accord. Allstate Ins. Co. v. Bauer*, 96 Wn. App. 11, 16, 977 P.2d 617 (1999). *See also State Farm Fire & Cas. Co. v. Parrella*, 134 Wash. App. 536, 540-41, 141 P.3d 643 (2006); *Lloyd v. First Farwest Life Ins. Co.*, 54 Wn. App. 299, 302–04 (1989); *Safeco Ins. Co. of Am. v. Dotts*, 38 Wn. App. 382, 385–86 (1984).

In *Unigard*, for example, a boy broke into a building and set a fire. The court held that, even though the boy did not intend or expect to cause damage to the building, the damage was not caused by an accident. *Unigard*, 20 Wn. App. at 263–64. In *Lloyd*, the insured suffered a cerebral aneurysm from deliberately inhaling cocaine. The court held that treating this unintended result as a covered "accident" would "'obliterate' the distinction at common law between 'accidental results' and 'accidental means.'" *Lloyd*, 54 Wn. App. at 301 (quoting

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 18
Case No.: C15-cv-01000

SELMAN BREITMAN LLP
800 Fifth Avenue, Suite 4100
Seattle, WA, 98104
T: (206) 447-6461  F: (206) 588-4185

672084.1 380.34160

1   *Whiteside v. New York Life Ins. Co.*, 7 Wn. App. 792, 503 P.2d 1107 (1972)).  In *Dotts*, the

2   insured slapped the victim's face, intending to gain the victim's attention.  Holding that the

3   victim's unintended death from the slap was not an "accident" for insurance purposes, the court

4   explained "that an accident is 'never present' when a deliberate act is performed absent an

5   'independent' unforeseen act." *Dotts*, 38 Wn. App. at 387 (quoting *Johnson v. Business Men's*

6   *Assur. Co. of Am.*, 38 Wn.2d 245, 249, 228 P.2d 760 (1951)).  In *Parrella*, a teenager fired a BB

7   gun at his friend as a prank, unintentionally hitting him.  There was no insurance coverage for

8   the unintended injury because a "prudent person . . . would know that shooting a loaded BB gun

9   could cause injury."  *Parrella*, 134 Wn. App. at 541.  The insured's subjective intent was

10  irrelevant. *Id.* (citing *Grange Ins. Ass'n v. Authier*, 45 Wn. App. 383, 386, 725 P.2d 642 (1986)).

11          Washington courts routinely decline to find a duty to defend where the complaint against

12  the insured alleges intentional or fraudulent conduct.  *See, Grange Ins. Ass'n. v. Roberts*, 179

13  Wn. App. 739 (2013); *USAA v. Speed*, 179 Wn. App. 184 (2014) (no coverage for alleged road

14  rage); *State Farm & Casualty Co. v. Heather Ridge L.P.,* 2013 U.S. Dist. Lexis 6747 (W. Dist.

15  WA 2013) (no duty to defend where complaint alleged insured fraudulently concealed defects to

16  apartments).

17          Likewise, here, the underlying actions alleged no accidents.  They alleged an intentional

18  scheme to defraud the plaintiffs.  AMS's deliberate fraudulent business practices are not covered

19  "occurrences" under the Scottsdale policies.

20              **3.      AMS's extrinsic evidence failed to show coverage.**

21          As explained above, after Scottsdale denied coverage, AMS submitted extrinsic

22  information in an effort to show the possibility of property damage in the underlying actions.

23  None of this information, however, changed the foregoing conclusions.  Rather, it did just the

24  opposite: it confirmed that the underlying actions involved economic damages caused by

25  intentional, fraudulent conduct and thus failed to trigger any duty to defend.

26

---

SCOTTSDALE INSURANCE COMPANY'S MOTION                SELMAN BREITMAN LLP
FOR SUMMARY JUDGMENT - 19                            800 Fifth Avenue, Suite 4100
Case No.: C15-cv-01000                               Seattle, WA, 98104
                                                     T: (206) 447-6461  F: (206) 588-4185

1   "[A]ssuming no ambiguities in the pleadings, the insurer need not look beyond the face

2   of the pleadings." *R.A. Hanson Co., Inc. v. Aetna Ins. Co.*, 26 Wn. App. 290, 295–96, 612 P.2d

3   456 (1980).  Facts outside the complaint may be considered only if "'(a) the allegations are in

4   conflict with facts known to or readily ascertainable by the insurer or (b) the allegations of the

5   complaint are ambiguous or inadequate.'" *Atl. Mut. Ins. Co. v. Roffe, Inc.*, 73 Wn. App. 858,

6   862, 872 P.2d 536 (1994) (quoting *E-Z Loader Boat Trailers, Inc. v. Travelers Indem. Co.*, 106

7   Wn.2d 901, 908, 726 P.2d 439 (1986)).  Here, again, there was no ambiguity in the pleadings,

8   which clearly raised claims that were not covered under the Scottsdale policies.

9   Nonetheless, Scottsdale considered AMS's extrinsic information and correctly concluded

10  that it did nothing to support AMS's claim.  AMS pointed to the declarations of its former

11  employees who testified about their participation in the fraudulent scheme to falsify work-order

12  data. (Exs. 37–48.)  Although AMS contended that this scheme could have potentially resulted

13  in property damage, none of these witnesses represented that any such damage actually occurred.

14  In an effort to fill this gap, AMS submitted the declaration of Undersecretary Cramer.

15  (Ex. 49.)  Although Mr. Cramer mentioned that military families had been affected by life safety

16  issues at locations managed by AMS/Pinnacle, he was also quick to clarify that he was "***not***

17  ***suggesting that these incidents were the direct result of conduct by Pinnacle.***"  (*Id.*, ¶ 7

18  (emphasis added).)  He made this assertion ***not*** to support a claim for damages against AMS, but

19  to justify the "prompt removal" of AMS as a property manager. (*Id.*, ¶ 8.)

20  Extrinsic evidence, of course, cannot serve as a basis to deny coverage. *See Expedia*, 180

21  Wn.2d at 803.  The point, however, is that AMS's proffered evidence utterly failed to show a

22  covered claim.  Instead, it simply confirmed the unavoidable interpretation that the eight corners

23  of the policies and the complaints did not establish coverage.

24

25

26

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 20
Case No.: C15-cv-01000

SELMAN BREITMAN LLP
800 Fifth Avenue, Suite 4100
Seattle, WA, 98104
T: (206) 447-6461  F: (206) 588-4185

**B.**     **Any coverage would be barred by express policy exclusions.**

Because the underlying actions do not assert any covered claims, it is not necessary to analyze coverage exclusions.  However, AMS's claims against Scottsdale fail for the additional and independent reason that any hypothetical property damage or bodily injury alleged to have been caused by an accidental occurrence would have been subject to policy exclusions.  In particular, the policies exclude: (1) expected or intended injury; and (2) damage to property owned or rented by a named insured.  All of the types of harm, which AMS claims may have possibly occurred in the underlying actions, would be subject to one or both of these exclusions.

**1.**     **All injuries alleged in the underlying actions were expected or intentional.**

In addition to requiring an "occurrence," which must be accidental, the policies also expressly exclude injury or damage that is "expected or intended from the standpoint of the insured." (Ex. 6, p. 22; Ex. 8, p. 23; Ex. 9, p. 22; Ex. 10, p. 25.)  In deciding whether an insured subjectively expected or intended the damage, the Court may "rely on facts from which an inference about the insured's state of mind must be drawn, such as the obviousness of already occurring harm." *Queen City Farms, Inc. v. Cent. Nat. Ins. Co. of Omaha*, 126 Wash. 2d 50, 69, 882 P.2d 703, 714 (1994) (quoting K. Abraham, *Environmental Liability Insurance Law* 134 (1991)).  Intent to injure is imputed to the insured as a matter of law when the insured engages in obviously harmful conduct.  *See Rodriguez v. Williams*, 107 Wn.2d 381, 387, 729 P.2d 627 (1986) (imputing injurious intent to insured in claim based on statutory rape).

Here, the theoretical property damage that AMS contends possibly could have been raised in the underlying actions would all have been expected or intended as a matter of law.  It cannot rationally be asserted that a party who steals someone's scrap metal does not intend or expect that the person from whom it is stolen will be deprived of its use.  Likewise, a property manager that fails to repair a smoke or carbon monoxide detector, while representing that it has

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 21
Case No.: C15-cv-01000

SELMAN BREITMAN LLP
800 Fifth Avenue, Suite 4100
Seattle, WA, 98104
T: (206) 447-6461  F: (206) 588-4185

672084.1 380.34160

1    been repaired, cannot reasonably claim that it was somehow unexpected that residents would

2    thereby be placed at risk of injury from smoke or carbon monoxide damage.

3    **2.       The policies exclude damage to property owned, rented, or possessed by the underlying plaintiffs.**

4

5            Finally, the Scottsdale policies contain exclusion "j," which essentially prohibits

6    coverage for damage to property under the insured's control.  Two subsections are relevant here:

7    subsection j(1) excludes damage to "[p]roperty you own, rent, or occupy"; and subsection j(4)

8    excludes damage to "[p]ersonal property in the care, custody or control of the insured."  (Ex. 6,

9    p. 24; Ex. 8, p. 25; Ex. 9, p. 24, Ex. 13, p. 27.)  The purpose of such exclusions is "to prevent a

10   general liability policy from providing first-party benefits to the insured."  *State Farm Fire &*

11   *Cas. Co. v. English Cove Ass'n, Inc.*, 121 Wn. App. 358, 360–61, 88 P.3d 986 (2004); *see also*

12   *Cle Elum Bowl, Inc. v. N. Pac. Ins. Co.*, 96 Wn. App. 698, 704, 981 P.2d 872 (1999) (enforcing

13   exclusion for damage to property "you own, rent, or occupy").

14           In analyzing exclusion j(1), the Court must first determine who owned or rented the

15   subject properties.  The MBMH action alleged that MBMH and CMC either owned or rented the

16   subject properties.  According to the PMAs, which were attached to the original complaint and

17   incorporated by reference in the Fourth Amended Complaint, MBMH and CMC were the

18   owners.  (Ex. 17 at *Ex. II* p. 1, *Ex. IV* p. 1; Ex. 21, p. 7.)  The underlying plaintiffs alleged,

19   however, that MBMH and CMC "actually hold the real property pursuant to fifty-year leases."

20   (Ex. 21, p. 7.)  Similarly, the PMAs attached to and incorporated by reference in the Fort

21   Benning complaints (Ex. 12, p. 14) identified FBFC and FBRC as owners of the Fort Benning

22   and Fort Belvoir properties.  (Ex. 12 at *Ex. 1* p. 1, *Ex. 2* p. 1.)

23           Because MBMH, CMC, FBFC, and FBRC either owned or rented the subject property,

24   and exclusion j(1) applies to property "you own, rent, or occupy," the next question is whether

25   these entities qualify as "you."  The policies define the "you" as the named insured in the

26

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 22
Case No.: C15-cv-01000

SELMAN BREITMAN LLP
800 Fifth Avenue, Suite 4100
Seattle, WA, 98104
T: (206) 447-6461  F: (206) 588-4185

declarations and "any other person or organization qualifying as a Named Insured under this policy." (Ex. 6, p. 21; Ex. 8, p. 22; Ex. 9, p. 21; Ex. 10, p. 24.)

As detailed above, the policies defined the named insureds as AMS and all affiliates, associated or allied companies, partnerships, joint ventures, etc. (Ex. 6, pp. 82–83; Ex. 8, p. 6 Ex. 9, p. 7; Ex. 10, p. 7.) The named insureds also included any entity for which a named insured was responsible for obtaining insurance. (*Id.*)

MBMH, CMC, FBFC, and FBRC are named insureds, and therefore "you" under the policies, for two reasons. First, they were unquestionably affiliated, associated, allied, partnerships, or joint ventures with AMS. The MBMH plaintiffs, for example, alleged that AMS and AMSC (collectively referred to in the underlying action as "Pinnacle") formed affiliates to serve as minority members in Clark Pinnacle LLC, which in turn were "the managing members of several 'Owner' limited liability companies, including Co-Plaintiffs MBMH and CMC." (Ex. 21, pp. 2, 7 (footnote omitted).) The Fort Benning action alleged that AMS had similar relationships to FBFC and FBRC. (Ex. 12, p. 2.) These allegations describe an affiliation, joint venture, or other similar relationship with AMS, which renders MBMH, CMC, FBRC, and FBFC named insureds.

Second, these entities also qualified as named insureds because they were entities for which the named insured had the responsibility for placing insurance. (Ex. 6, pp. 82–83; Ex. 8, p. 6 Ex. 9, p. 7; Ex. 10, p. 7.) The PMAs—attached to and incorporated by reference in the complaints—identified MBMH, CMC, FBRC, and FBFC as the "Owners." The MBMH and CMC PMAs identified AMSC as the property manager and provided that it "shall obtain and keep in force" insurance coverage "for the benefit of Owners and Manager and such additional insured as may be necessary from time to time." (Ex. 17 at *Ex. II* pp. 1, 9, *Ex. IV* pp. 1, 8.) The Fort Benning and Fort Belvoir PMAs are identical, requiring AMSE, as the property manager, to obtain insurance for FBRC and FBFC as the owners. (Ex. 12 at *Ex. 1* pp. 1, 8, *Ex. 2* pp. 1, 9).

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 23
Case No.: C15-cv-01000

SELMAN BREITMAN LLP
800 Fifth Avenue, Suite 4100
Seattle, WA, 98104
T: (206) 447-6461  F: (206) 588-4185

672084.1 380.34160

1   Both AMSE and AMSC are named insureds.  (Ex. 6, p. 83; Ex. 8, p. 6; Ex. 9, p. 7; Ex. 10, p. 7.)

2   Thus, FBFC, FBRC, MBMH and CMC are named insureds under the policies, as entities for

3   which the named insured has the responsibility for placing insurance.

4          As for exclusion j(4), Washington courts have held that exclusions for property damaged

5   while in the insured's "care, custody or control" are enforceable and unambiguous.  *See Madden*

6   *v. Vitamilk Dairy, Inc.*, 59 Wn.2d 237, 239, 367 P.2d 127 (1961); *Wada v. Nationwide Mut. Ins.*

7   *Co.*, 42 Wn. App. 433, 435-36, 711 P.2d 384 (1985); *New Hampshire Ins. Co. v. Abellera*, 6 Wn.

8   App. 650, 652, 495 P.2d 668 (1972).   This exclusion would bar coverage if the underlying

9   plaintiffs had asserted a hypothetical claim for AMS's conversion of scrap metal at the Fort

10  Benning project.  Necessarily, to have harvested and sold scrap metal for its own benefit, AMS

11  would have had custody or control over it.  As such, Scottsdale had no duty to defend any of the

12  claims that, according to AMS, the underlying plaintiffs could have theoretically raised.

13                    **V.    CONCLUSION**

14          For the reasons set forth above, Scottsdale respectfully requests that the Court grant

15  summary judgment in its favor.

16
17          DATED this 6th day of November, 2015.

18                              OGDEN MURPHY WALLACE, PLLC

19
                                By s/Geoff Bridgman
20                                 Geoff Bridgman, WSBA #25242
                                   Mary Re Knack, WSBA #26945
21                                 Tracy Grant, WSBA #40877
                                   901 Fifth Avenue, Suite 3500
22                                 Seattle, Washington 98164-2008
                                   Tel: 206.447.7000/Fax: 206.447.0215
23                                 Email: gbridgman@omwlaw.com
                                   Attorneys for Plaintiff Scottsdale
24

25

26

---

SCOTTSDALE INSURANCE COMPANY'S MOTION               SELMAN BREITMAN LLP
FOR SUMMARY JUDGMENT - 24                             800 Fifth Avenue, Suite 4100
Case No.: C15-cv-01000                                    Seattle, WA, 98104
                                                     T: (206) 447-6461  F: (206) 588-4185

SELMAN BREITMAN, LLP

By s/Peter Mintzer
    Peter Mintzer, WSBA #19995
    800 Fifth Avenue, Suite 4100
    Seattle, Washington 98104
    Tel: 206.447.6461/Fax: 206.588.4185
    Email: pmintzer@selmanlaw.com
    Attorneys for Plaintiff Scottsdale

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 25
Case No.: C15-cv-01000

SELMAN BREITMAN LLP
800 Fifth Avenue, Suite 4100
Seattle, WA, 98104
T: (206) 447-6461  F: (206) 588-4185

672084.1  380.34160

**CERTIFICATE OF SERVICE**

I certify under the laws of the United States of America that on the 6th day of November, 2015, I electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using the CM/ECF System and served counsel below by the method indicated:

| | |
|---|---|
| Dwain Clifford, pro hac vice<br>Kevin Mapes, WSBA #40416<br>Nicholas Thede, pro hac vice<br>Kyle A. Sturm, pro hac vice<br>James Clark Prichard, WSBA #30077<br>Ball Janik LLP<br>101 SW Main Street, Suite 1100<br>Portland, OR  97204<br>**Attorneys for Insureds** | [   ]   U.S. Mail<br>[   ]   Messenger<br>[   ]   Email<br>[ X ]   CM/ECF |
| Linda L. Foreman, WSBA #11817<br>Bowers Foreman, PLLC<br>5825 60th St. SE<br>Snohomish, WA  98290<br>**Attorneys for Insureds** | [   ]   U.S. Mail<br>[   ]   Messenger<br>[   ]   Email<br>[ X ]   CM/ECF |
| Stephen Skinner, WSBA  #17317<br>Andrews Skinner, P.S.<br>645 Elliott Avenue W. Ste 350<br>Seattle, WA  98119<br>**Attorneys for Lexington**<br>stephen.skinner@andrews-skinner.com | [   ]   U.S. Mail<br>[   ]   Messenger<br>[   ]   Email<br>[ X ]   CM/ECF |

DATED this 6th day of November, 2015.

s/Geoff Bridgman, WSBA#25242
Geoff Bridgman

SCOTTSDALE INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 26
Case No.: C15-cv-01000

SELMAN BREITMAN LLP
800 Fifth Avenue, Suite 4100
Seattle, WA, 98104
T: (206) 447-6461  F: (206) 588-4185

672084.1 380.34160